

# THE ATTORNEY GENERAL

# OF TEXAS

AUSTIN, TEXAS 78711

CRAWFORD C. MARTIN
ATTORNEY GENERAL

June 5, 1967

Honorable Robert S. Calvert
Comptroller of Public Accounts
Capitol Building
Austin, Texas

Opinion No. M-83

Re: Whether corporations created
for the purpose of providing
TV cable services are requir-
ed to pay the gross receipts
tax provided by Article 11.02,
Title 122A, Taxation-General,
Dear Mr. Calvert:                    V.C.S.

You have requested the opinion of this Office on the
above captioned question. Section (1) of Article 11.02, Title
122A, Taxation-General, Vernon's Civil Statutes reads, in part,
as follows:

"(1) Each individual, company, corpora-
tion, or association owning, operating, managing
or controlling any telegraph lines in this State,
or owning, operating, controlling or managing
what is known as wireless telegraph stations,
for the transmission of messages or aerograms,
and charging for the transmission of such mes-
sages or aerograms, shall make quarterly, on the
first days of January, April, July and October
of each year, a report to the Comptroller, under
oath of the individual, or of the president,
treasurer, or superintendent of such company,
corporation, or association, showing the gross
amount received from all business within this
State during the preceding quarter, in the pay-
ment of telegraph or aerogram charges, includ-
ing the amount received on full rate messages and
aerograms, and half rate messages and aerograms,
and from the lease or use of any wires or equip-
ment within the State during said quarter, ...
Said individuals, companies, corporations, and

-370-

associations, at the time of making said report, shall pay to the State Treasurer, and there is hereby levied upon said individuals, companies, corporations, and associations, an occupation tax for the quarter beginning on said date, ..."

We think that a determination of whether corporations which provide TV cable service are subject to the provisions of Article 11.02 requires a detailed examination of the facts. The following is an excerpt from one of the briefs submitted in connection with this request.

"'E. Stratford Smith[1] in his March 7, 1967, position paper entitled Legal Status of Community Antenna Television Systems Under Federal and State Regulating Statutes, writes as follows in this connection:

"' ...

"'A community antenna television system is a facility utilizing a receiving antenna or antennas, connection wire, cable or relay facilities and associated equipment, for the reception by subscribing members of the public of the signals of one or more broadcast stations.

"'A community antenna is, as the term implies, a master television receiving antenna erected and designed to service a community, or such part thereof as is practical to serve, or as may have a requirement for the service. It is technically and functionally analogous to the master antenna systems installed in apartment houses and hotels to permit service to part or all of the apartments, rooms, or suites by means of a single antenna system. Generally, community antennas are found in areas where, because of the interaction of topographic or geographic or structural conditions, and technological and economic factors, reception of television signals

---

1. Former executive secretary and general counsel of the National Community Television Association, Inc., and now senior partner, Smith, Pepper, Shack & L'Heureux, 1101 17th St., N.W., Washington, D.C. 20036.

by conventional antennas is either: (1) non-existent, (2) of unsatisfactory quality, or (3) possible only with the aid of costly, tall and sometimes unsightly roof-top antennas or by means of antennas placed on high elevations or other suitable locations. For example, distance from originating stations, intervening obstacles such as mountains or high buildings, poor ground conductivity or seasonal and other changes in atmospheric conditions can often impair or make impossible good television reception. Where such conditions prevail a master community antenna is erected at a suitable location, usually on a high elevation or the top of a very tall tower erected for that purpose, where reception of the signals of the desired stations is available in sufficient field strength to produce good quality pictures.

"'A coaxial cable or other type of antenna lead or run extends from the antenna to the area of community to be served where connection is made with coaxial or other wire distribution lines which, in turn, serve the individual subscriber "house drops." The antenna lead and distribution cable facilities are generally supported on electric power or telephone utility poles for which rentals are paid under contract with those companies. In a few cases these facilities are placed underground or on privately owned poles. Easements and right-of-way to use streets and alleys are generally obtained from the municipal governments. In a limited number of cases these are exclusive rights, but for the most part are not.

"'Describing the technical function of a community antenna system generally, the signals received from the distant stations, as well as from local stations in many instances, are received at the master antenna and passed through amplifying equipment at that point and at appropriate locations along the antenna run and distribution trunks. This procedure is employed to maintain adequate signal strength for the signals to pass through the system to the television receivers in the home, and to produce acceptable or better pictures on those receivers. ...

-372-

"'...

"'Community antennas are capable of receiving the signals of more than one station simultaneously. As a general rule, antenna sites are selected where the maximum number of nonduplicating and noninterfering television channels can be received in sufficient strength and quality to produce acceptable pictures. The antennas are designed and oriented, when installed, to receive the desired signals and to reject, to the extent possible, the undesired channels. Electrical interference can be caused by the channels on the cable radiating outside of the confines of the cable into the same or adjacent channels which are being received directly off-the-air. In order to minimize such interference and permit the compatible operation of CATV systems with direct off-the-air reception, the Federal Communications Commission has promulgated specific rules and regulations applicable to community antenna television systems to limit such "incidental radiation." Thus, by Order adopted July 11, 1956, the Commission adopted Subpart D of Part 15 of its Rules and Regulations applicable to "Incidental and Restricted Radiation Devices," entitled "Community Antenna Television Systems."'"

Let us examine the plain language of Article 11.02. The specific individuals, companies, corporations or associations subject to this tax are those "owning, operating, managing or controlling any telegraph lines in this State, or owning, operating, controlling or managing what is known as wireless telegraph stations, for the transmission of such messages or aerograms, ..." (Emphasis supplied.) Corporations created for the purpose of providing TV cable services are not providing the services above quoted. Rather, the occupation in which such corporations are engaged is an adjunct to the occupation of television corporations operating television stations. Therefore, under the plain and unambiguous language of the statute, TV cable service corporations are not subject to the occupation tax imposed by Article 11.02.

If we be in error in so grounding our holding, and if the statute may properly be subject to construction, the law has long been settled in this State that ambiguous tax statutes must be

strictly construed in favor of the taxpayer and that the courts will not extend the scope of a taxing statute by implication. 54 Tex.Jur.2d 166, 167, Taxation, § 41. The authorities in support of the foregoing propositions are legion. Western Union Tel. Co. v. State of Texas, 62 Tex. 630 (1884); Philtex Chemical Co. v. Sheppard, 219 S.W.2d 1010 (Tex.Civ.App. 1949, error ref., n.r.e.); Calvert v. Audio Center, Inc., 346 S.W.2d 420 (Tex.Civ. App. 1961, error ref., n.r.e.); Texas Unemployment Compensation Comm. v. Bass, 137 Tex. 1, 151 S.W.2d 567 (1941); Calvert v. Humble Oil & Refining Co., 381 S.W.2d 229 (Tex.Civ.App. 1964, error ref., n.r.e.).

We are aware that this Office has held in Opinions C-702 and C-702-A (1966) that TV cable corporations are within the provisions of Article 1416, V.C.S., which authorizes corporations created for the purpose of constructing and maintaining magnetic telegraph lines to set their poles, wires and other fixtures across public roads, streets and waters of this State in such manner as not to incommode the public. Opinion C-702-A expressly modified C-702 in so far as it contained statements to the effect that TV cable corporations are public utilities, but adhered to the result reached in C-702 on the ground that such corporations are subject to regulation and that this regulation was limited to the exercise of the police power of the State.

Various cases are cited in C-702 in which courts have held that television transmission is an integral part of the telephone and telegraph business regardless of the type of system used, i.e., coaxial cable or ordinary telephone wires. These cases were concerned either with the jurisdiction of a State Public Service Commission[2] or with eminent domain problems.[3]

Whether a particular State Public Service Commission has jurisdiction of regulating the transmission of television broadcasts by wire depends, of course, upon the power of regulation granted the Public Service Commission under the State laws.

The statutes authorizing the extent of the jurisdiction of the New York Public Service Commission at the time of the decision

2. Independent Theatre Owners v. Arkansas Public Service Comm., 235 Ark. 668, 361 S.W.2d 642 (1962).

3. Ohio Tel. & Tel. Co. v. Steen, 85 N.E.2d 579 (1949); Ball v. American Telephone and Telegraph Co., 227 Miss. 218, 86 So.2d 42 (1956).

in Cerrachi Television Corp. v. Public Service Com'n, 267 N.Y.S. 2d 969 (Sup.Ct., Albany County, New York, 1960), authorized the regulation by the Commission of the business of affording telephonic communication for hire. The court held that a telephone company's rental of pole space to the television corporation which was engaged in the business of transmitting TV broadcasts over wires to customers was not part of the public service performed by the company in the business of telephonic communication and, therefore, was not subject to regulation by the Public Service Commission. We quote the following excerpt from pages 972-973 of the opinion:

"The business of the petitioner is of recent origin arising from the rapid expansion of the television industry. Patently the picking off-the-air standard broadcasts of commercial television stations and by amplification transmitting the same over wires directly to the household patron is not in any sense telephonic communication. Basically, then, the petitioner's business is not subject to the jurisdiction of the commission as the statutes are now written. Whether such an industry should be regulated is for the legislature and not for the courts.

"The petitioner argues that since the company's poles are, by statutory definition, (Public Service Law, § 2, sub. 18), a part of the company's 'telephone line' and since the commission has regulatory jurisdiction over all telephone corporations and their equipment, the poles and the use of the poles by the attachment of the petitioner's facilities are subject to the commission's regulation. The petitioner argues that since the poles and the attachments fall within the regulatory sphere of the commission that the commission should assume to regulate the charges for the attachment of petitioner's wires thereto.

" ...

"The rental of the pole space by the company to the petitioner is not part of the public service performed by the company in the business of telephonic communication. (Matter of Gamewell Co. v. Public Service Commission of State of N.Y., 8 A.D.2d 232, 188 N.Y.S.2d 107, leave to appeal denied 7 N.Y.2d 706, 193 N.Y.S.2d 1027, 162 N.E.2d 754). Such a non-utility activity of a telephone company is not subject to regulation by the commission. (Matter of Solomon v. Public

Service Comm. supra; Matter of National Merchandising Corp., supra)."

It is evident that entirely different rules of construction are applicable to statutes pertaining to the regulation of television service corporations and their powers of eminent domain, and that these rules cannot be applied when a tax statute is being construed.

The source of Article 11.02 was Article 7059, V.C.S. Article 7059 was last amended by Acts 1945, 49th Leg., p. 471, ch. 299, § 1, and was brought forward unchanged as Article 11.02 in the recodification of the tax laws enacted by Acts 1959, 56th Leg., 3rd C.S., p. 187, ch. 1. The 1959 codification is carried in 20A, Title 122A, Tax.-Gen., V.C.S. Since TV cable corporations were in existence at the time of the last amendment of Article 7059 and at the time of its being carried forward into Title 122A, it must be assumed that, had the Legislature intended to tax such corporations, it would have done so. Section 3 of Title 122A, enacted at the time of the codification of the taxation statutes, reads as follows:

"This act shall be construed to make a substantive change in the prior law only where the language of this act manifests a clear intent to make such a change."

In Humble Oil & Refining Co. v. Calvert, 10 Tex.Sup.Ct. Journal No. 23, p. 254 (March 15, 1967), the court was concerned with the question of whether the Legislature by enacting Article 12.02, Title 122A, Tax.-Gen., V.C.S., in 1959 intended to change the corporate franchise tax allocation formula with respect to receipts from intangibles. The Comptroller's contention was that Article 12.02 not only codified Article 7084, but also amended it. The court refused to sustain this contention. In the course of the opinion, the court pointed out that the only difference between Article 7084 and Article 12.02 was the addition of four subsections which specifically allocated certain items to "business done in Texas." The court held that these subsections were insufficient to constitute an amendment as claimed and did not effectuate a change in the ambiguous phrase "business done in Texas." For over forty years the Texas rule for determining which receipts from intangibles should be allocated in Texas had been the "location of payor" test. The court deemed it of importance that the Comptroller had first asserted the "commercial domicile" test in 1963. At page 257 of the opinion, the court quoted Section 3 of Title 122A, above quoted, and concluded that in the absence of specific statutory language

specifying "commercial domicile," the Comptroller was attempting to look outside the statute and outside the common law. At page 257, the court said:

> "Section 3, supra, forbids the Comptroller to look anywhere except 'the language of this Act,' and any change must there be manifested clearly."

Your departmental construction of Article 7059 prior to the 1959 codification did not include TV cable service corporations as being within the provisions of Article 11.02. As aforesaid, the 1959 codifications made no change in Article 7059, nor have you changed your construction thereof to this date. It is common knowledge that many TV cable service corporations have been in existence for a good many years. Therefore, even if we were in error in holding that the plain language of Article 11.02 excluded TV cable corporations from the tax therein imposed, Humble precludes any other construction.

## SUMMARY

> Corporations created for the purpose of providing TV cable services are not required to pay the gross receipts tax provided by Article 11.02, Title 122A, Tax.-Gen., V.C.S.

Yours very truly,

CRAWFORD C. MARTIN
Attorney General of Texas

MMP:ms

Prepared by Marietta McGregor Payne
Assistant Attorney General

APPROVED:
OPINION COMMITTEE
Hawthorne Phillips, Chairman
W. V. Geppert, Co-chairman
Ralph Rash
John Reeves
J. Arthur Sandlin
W. E. Allen

STAFF LEGAL ASSISTANT
A. J. Carubbi, Jr.